**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                                              |     |                                    |
| -------------------------------------------- | --- | ---------------------------------- |
|                                              | )   |                                    |
| LAURENCE M. BALL,                            | )   |                                    |
|                                              | )   |                                    |
| Plaintiff,                                   | )   |                                    |
|                                              | )   |                                    |
| v.                                           | )   | Civil Action No. 13-cv-603 (TSC)   |
|                                              | )   |                                    |
| BOARD OF GOVERNORS OF THE                    | )   |                                    |
| FEDERAL RESERVE SYSTEM,                      | )   |                                    |
|                                              | )   |                                    |
| Defendant.                                   | )   |                                    |
|                                              | )   |                                    |

**MEMORANDUM OPINION**

In this Freedom of Information Act case, Plaintiff Laurence Ball seeks four documents from the Federal Reserve System's Board of Governors (the "Board")—two memorandums analyzing the Federal Reserve's legal justification for extending loans to Bear Stearns/JPMorgan and American International Group ("AIG") during the 2008 financial crisis, and two spreadsheets listing the collateral securing those loans. The parties have filed cross-motions for summary judgment. Upon consideration of the motions, the oppositions and the replies thereto, the entire record, and for the following reasons, Plaintiff's motion is denied and Defendant's motion is granted.

## I.    BACKGROUND

### a.   Overview of the Federal Reserve System

Congress created the United States Federal Reserve System through passage of the Federal Reserve Act in 1913. The System is comprised of the Board and twelve regional Federal Reserve Banks ("FRBs"). Each FRB operates within its own region of the United States. The Board is composed of seven members appointed by the President and confirmed by the Senate,

and acts as the central supervisory authority of the Federal Reserve System.  12 U.S.C. § 241.  It

is responsible for overseeing the operation of the system and promulgating and administering

regulations, and plays a key role in supervising and regulating the United States banking system.

*See McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 849 F. Supp. 2d 47, 52 (D.D.C.

2012).  The FRBs are considered the "operating arm" of the Reserve System.  They engage in

both public and private functions by carrying out federal monetary policy while also holding

deposits and making loans to private banks.

As a result of the Great Depression, in 1932 Congress amended the Federal Reserve Act

and added paragraph 3 to section 13.  Section 13(3) allows the Board, "[i]n unusual and exigent

circumstances," and "by the affirmative vote of not less than five members," to "authorize any

[FRB]" to extend emergency loans to individuals, partnerships, and corporations.  12 U.S.C. §

343(3)(A).  The FRB must conduct an independent investigation into whether the potential

loan's recipient is able to first "secure adequate credit . . . from other banking institutions."  *Id.*

Between 1932 and 1936, FRBs were authorized to make approximately 123 loans totaling $1.5

million.  (Pl. Mot. 4).  FRBs made no loans pursuant to section 13(3) again until 2008.  (*Id.*).

    b.  Bear Stearns and AIG

Beginning with the deterioration of the U.S. housing market in late 2007 and 2008,

financial markets experienced substantial uncertainty that resulted in severe liquidity pressures

upon various financial institutions.  (Def. Mot. 4).  In early March 2008, the Board became

aware that Bear Stearns, one of the companies experiencing liquidity problems, might soon

declare bankruptcy.  The Board became increasingly concerned about the potential impact of a

Bear Stearns bankruptcy on broader financial markets.  (*Id.*).  As a result, it began collecting

real-time data on, among other things, various financial institutions' exposure to Bear Stearns in

2

an effort to assess the gravity of the potential bankruptcy.  Bear Stearns did not qualify as a depository institution and was therefore ineligible to borrow through the Federal Reserve's regular short-term lending program.  As a result, on March 14, 2008, the Board authorized the Federal Reserve Bank of New York ("FRBNY"), pursuant to section 13(3), to extend an emergency, temporary loan to Bear Stearns through JPMorgan Chase & Co.  (*Id.* at 5).  On March 16, 2008, the Board authorized the FRBNY to make a second emergency transaction to JPMorgan in order to facilitate its acquisition of Bear Stearns.  Under this authorization, the FRBNY made a non-recourse loan to a limited liability company, later named Maiden Lane LLC (the "Maiden Lane Loan"), with the loan secured by the Bear Stearns assets that Maiden Lane acquired.  (*Id.*).

AIG, the world's largest provider of life, health, and casualty insurance, was also experiencing the effects of similar market pressures in 2008.  (*Id.* at 5-6).  On September 12, 2008, the Board became aware of AIG's impending liquidity crisis.  As a result, it encouraged AIG to pursue private sector options and began to analyze the broader implications of AIG's crisis.  (*Id.* at 6).  On September 16, 2008, after determining that "a disorderly failure of AIG could add to already significant levels of financial market fragility and lead to . . . materially weaker economic performance," (Pl. Mot. 5), the Board again invoked section 13(3) and authorized the FRBNY to lend up to $85 billion to AIG (the "AIG Loan").  (Def. Mot. 7).  The FRBNY established the AIG Revolving Credit Facility, which was secured by nearly all of AIG's assets, in order to provide direct financial support to AIG.  (*Id.*).

c.  Ball's FOIA Request

On October 10, 2012, Plaintiff Ball, an economics professor at Johns Hopkins University, submitted to the Board a FOIA request seeking documents related to the Bear Stearns and AIG

loans.  Ball sought two legal memorandums prepared by Board staff addressing the Board's

section 13(3) authority—one for the Maiden Lane Loan ("Document 1") and one for the AIG

Loan ("Document 2").  (Caperton Decl. Ex. A).  Ball also sought two bank examination

spreadsheets identifying the assets pledged as collateral for the Maiden Lane Loan ("Document

3") and the AIG Loan ("Document 4").  (Pl. Mot. 7).

On December 20, 2012, the Board denied Ball's FOIA request in full, stating that the

requested documents consisted of exempt information pursuant to FOIA Exemptions 4, 5, and 8.

Ball appealed the Board's denial, and on January 31, 2013, the Board, while reversing its prior

decision on some of the previously invoked exemptions, ultimately denied Ball's appeal and

continued to withhold the four documents in their entirety.  Ball then filed the instant suit.

## II.     LEGAL STANDARD

### a.  Motion for Summary Judgment

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v.

Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or

defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).  "A party asserting that a

fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of

materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "A fact is 'material' if a dispute over it

might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or

unnecessary' do not affect the summary judgment determination."  *Holcomb*, 433 F.3d at 895

(quoting *Liberty Lobby*, 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  *See id.*  The party seeking

summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in his favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

    b.  <u>FOIA</u>

"FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Responsibility & Ethics in Washington v. DOJ*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)). FOIA requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under clearly delineated statutory language." *Id.* (internal quotation marks omitted); *see also* 5 U.S.C. § 552(a), (b).

"'FOIA cases typically and appropriately are decided on motions for summary judgment.'" *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). The district court conducts a *de novo* review of the government's decision to withhold requested documents under

any of FOIA's specific statutory exemptions.  5 U.S.C. § 552(a)(4)(B).  The burden is on the

agency to show that nondisclosed, requested material falls within a stated exemption.  *Petroleum*

*Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. §

552(a)(4)(B)).  In cases concerning the applicability of exemptions and the adequacy of an

agency's search efforts, summary judgment may be based solely on information provided in the

agency's supporting declarations.  *See, e.g., ACLU v. U.S. Dept. of Def.*, 628 F.3d 612, 619 (D.C.

Cir. 2011); *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 838 (D.C. Cir. 2001).  "If

an agency's affidavit describes the justifications for withholding the information with specific

detail, demonstrates that the information withheld logically falls within the claimed exemption,

and is not contradicted by contrary evidence in the record or by evidence of the agency's bad

faith, then summary judgment is warranted on the basis of the affidavit alone."  *ACLU*, 628 F.3d

at 619.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it

appears 'logical' or 'plausible.'"  *Id.* (internal quotation marks omitted) (quoting *Larson v. Dep't*

*of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  However, a motion for summary judgment should

be granted in favor of the FOIA requester "[w]hen an agency seeks to protect material which,

even on the agency's version of the facts, falls outside the proffered exemption."  *Coldiron v.*

*DOJ*, 310 F. Supp. 2d 44, 48 (D.D.C. 2004) (citing *Petroleum Info. Corp.*, 976 F.2d at 1433).

     The FOIA requires that "[a]ny reasonably segregable portion of a record shall be

provided to any person requesting such record after deletion of the portions which are exempt."

5 U.S.C. § 552(b).  More specifically, "[i]t has long been a rule in this Circuit that non-exempt

portions of a document must be disclosed unless they are inextricably intertwined with exempt

portions."  *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir.

1977).  In order to withhold a record or portion thereof under a FOIA exemption, "the

Government must make that showing in its *Vaughn* index and in such affidavits as it may submit therewith." *Kimberlin v. DOJ*, 139 F.3d 944, 950 (D.C. Cir. 1998). "The purpose of a *Vaughn* index is to permit adequate adversary testing of the agency's claimed right to an exemption, and those who contest denials of FOIA requests -- who are, necessarily, at a disadvantage because they have not seen the withheld documents -- can generally prevail only by showing that the agency's *Vaughn* index does not justify withholding information under the exemptions invoked." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) (internal quotation marks and citations omitted), *abrogated on other grounds by Milner v. Dep't of Navy*, 562 U.S. 562 (2011).

## III.   ANALYSIS

### a.   Adequacy of the Search

The parties dispute the adequacy of the Board's search with respect to one document— the collateral spreadsheet for the AIG Loan.  Ball argues that the Board should have searched the FRBNY's files in addition to the Board's own files, and this failure resulted in the Board only locating a partial list of the collateral pledged for the AIG Loan.  The Board responds that under its own regulations and the FOIA, it was not required to search the FRBNY's files, and therefore the search of its own files was adequate.

In ruling on the adequacy of an agency's search in response to a FOIA request, "[t]he question is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate.*  The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case.  In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith." *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994) (internal citations omitted).  An agency may prove the reasonableness of its

search via the declaration of a responsible agency official, so long as the declaration is reasonably detailed and not controverted by contrary evidence or evidence of bad faith. *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). There is no requirement that an agency search every record system, but the agency must conduct a good faith, reasonable search of those systems of records likely to possess the requested information. *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The agency declaration can demonstrate reasonableness by "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Sanders v. Obama*, 729 F. Supp. 2d 148, 155 (D.D.C. 2010), *aff'd sub nom. Sanders v. DOJ*, 10-5273, 2011 WL 1769099 (D.C. Cir. Apr. 21, 2011) (citation omitted). Once an agency has provided adequate affidavits, the burden reverts to the plaintiff to demonstrate the lack of a good faith search. *Id.* The presumption of good faith "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).

Ball's FOIA request sought a list of the specific assets pledged as collateral for the AIG Loan and their individual values as determined by the Federal Reserve. (Caperton Decl. Ex. A). The Board's search in response to this request is detailed in declarations by David G. Caperton, Special Counsel for Oversight Reviews in the Legal Division of the Board, and Louise L. Roseman, Director of Reserve Bank Operations and Payment Systems ("RBOPS") and the official responsible for overseeing RBOPS' search. Caperton and Roseman, with the assistance of Board staff, conducted a thorough search, the details of which are set forth in their sworn declarations.

Ball does not challenge the Board's search of its own records, and, based on the search procedures set forth in the Caperton and Roseman Declarations, the court confirms that the Board's search of its records was adequate. Caperton and Roseman are both responsible government agency officials and their testimonials are neither lacking in detail nor controverted by contrary evidence or evidence of bad faith. *See Military Audit Project*, 656 F.2d at 738.

Ball instead asserts that the Board should have searched FRBNY files in addition to its own files, and its failure to do so renders the Board's search inadequate. Ball argues that the Board's own regulations require it to search the FRBNY's files, and "[h]ad the Board properly searched all records systems . . . it might have uncovered a complete collateral listing for the AIG loan among the FRBNY's records." (Pl. Mot. 29). The Board responds that it was under no obligation to search FRBNY files because the records Ball seeks are not the type covered by Board regulations.

In its Rules Regarding Availability of Information, the Board defines "Records of the Board" as follows:

(i)(1) Records of the Board include:

(i) In written form, or in nonwritten or machine-readable form; all information coming into the possession and under the control of the Board, any Board member, any Federal Reserve Bank, or any officer, employee, or agent of the Board or of any Federal Reserve Bank, in the performance of functions for or on behalf of the Board that constitute part of the Board's official files; or

(ii) That are maintained for administrative reasons in the regular course of business in official files in any division or office of the Board or any Federal Reserve Bank in connection with the transaction of any official business.

12 C.F.R. § 261.2(i)(1). Prior courts have taken varying approaches on how to interpret this confusingly drafted regulation. As this court interprets it, Records of the Board (whether in category (i) or (ii)) must be "information coming into the possession and under the control of [a designated entity or employee] . . . in the performance of functions for or on behalf of the

9

Board."  Category (i) encompasses records "that constitute part of the Board's official files," which are defined in the regulation as "the Board's central records."  12 C.F.R. § 261.2(a). Category (ii) encompasses records "[t]hat are maintained for administrative reasons in the regular course of business in official files in any division or office of the Board or any Federal Reserve Bank in connection with the transaction of any official business."  Records of the Board therefore include: (1) records in the Board's central files, whether created by the Board or created by a Federal Reserve Bank working for or on behalf of the Board; and (2) records housed in a division or office of the Board or any Federal Reserve Bank for administrative reasons, so long as the record was created while that entity was working for or on behalf of the Board in connection with official business.  Crucial to the inquiry here, for a FRB record to be a Board record, the FRB must have been working for or on behalf of the Board.

While this interpretation is in some tension with the holdings of other courts,[1] this court finds it correct based on the structure of the regulation and its history.  Part of the confusion appears to stem from the practice of reading categories (i) and (ii) as entirely independent from one another.  Categories (i) and (ii) must be read in conjunction with each other to have any real

---

[1] For example, the Second Circuit has held that category (ii) includes "records of the twelve Federal Reserve Banks that are maintained for administrative reasons, in the regular course of business, in the Board's official files or by any Federal Reserve Bank, and in connection with the transaction of any official business."  *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 162 (2d Cir. 2010).  That interpretation appears to include *all* records of the FRBs regarding official business, which does not seem to be the proper scope of category (ii).  The Southern District of New York, in a slightly different formulation, held that Records of the Board include "records (1) constituting a part of the Board's official files and (2) maintained in the performance of functions for or on behalf of the Board, *or* records (1) maintained for administrative reasons, (2) in the regular course of business, (3) in the Board's official files, and (4) in connection with the transaction of any official business."  *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 273 (S.D.N.Y. 2009) (citations omitted), *aff'd*, 601 F.3d 143 (2d Cir. 2010).  The *Bloomberg* court went on to hold that "if a record is kept in *the Board's official files* at a FRB . . . it qualifies as a Board 'agency record.'"  *Id.* (emphasis in original).  This interpretation equates the reference to "Board's official files" in category (i) with "official files" in category (ii).  As this court interprets the regulation, the reference in category (ii) to "official files" is not a reference to the Board's official files, but instead a reference to the official files in "any division or office of the Board or any Federal Reserve Bank."  This interpretation is supported by other parts of the regulation, which differentiate between the Board's official files and other places Board records may be found.  *See* 12 C.F.R. § 261.2(n)(1) ("Search means a reasonable search . . . of the Board's official files and any other files containing Board records . . .").

meaning.  Read together, Records of the Board include two categories of records—the Board's

official files and "administrative reasons" records—both of which must satisfy the precondition

of being information created for or on behalf of the Board.

A prior version of the regulation is significantly clearer regarding the intended structure

of the provision:

> (d)(1) "Records of the Board" includes applications, rules, statements, opinions, orders, memoranda, letters, reports, accounts, and other written material, as well as magnetic tapes, computer printouts of information obtained through use of existing computer programs, maps, photographs, and other materials in nonwritten or machine readable form that are under the control of the Board, that contain information of the Board, and that:
>
>> (i) Constitute part of the Board's official files; or
>>
>> (ii) Are maintained for administrative reasons in the regular course of business in official files in any division or office of the Board or any Federal Reserve Bank in connection with the transaction of any official business.

Rules Regarding Availability of Information, Final Rulemaking, 53 Fed. Reg. 20,812, 20,815

(June 7, 1988).  When the Board amended the regulation to the current version to implement the

Electronic Freedom of Information Act Amendments of 1996, it did not indicate that it intended

to make any substantive changes to the definition of "Records of the Board."  *See* 62 Fed. Reg.

54,356 (Oct. 20, 1997).  The court therefore finds that the proper interpretation is that the

language before "that constitute" in category (i) is a precondition applicable to both records "that

constitute part of the Board's official files" and "that are maintained for administrative reasons"

in other locations.  This interpretation—that all Records of the Board must have been created

"for or on behalf of" the Board—is in accord with the Board's own interpretation asserted here

and in prior cases.  *See Auer v. Robbins*, 519 U.S. 452 (1997).

The question, then, is whether the FRBNY was acting "for or on behalf of" the Board

with respect to the AIG Loan.  If it was, the collateral spreadsheet Ball seeks may be a Record of

11

the Board, because while the court is satisfied that it is not in the Board's central records under category (i), it could be maintained at the FRBNY for administrative reasons under category (ii), meaning the Board should have searched the FRBNY's records in response to Ball's request.

The Board asserts that the FRBNY was not acting "on behalf of" the Board as it interprets the phrase in the regulation. The Board argues that "on behalf of" means "under delegated authority," and because the FRBNY was not acting under the delegated authority of the Board when it extended the AIG Loan, FRBNY records with respect to that loan are not Board records. (Def. Opp'n 16-18). The Board cites *Fox News Network* in support. In that case, the Second Circuit held that the FRBs were not operating on behalf of the Board or under the delegated authority of the Board when they extended the loans at issue. The Court found that those loans were issued under the FRBs' own statutory authority (12 U.S.C. § 347b(a)) and did not require Board authorization, meaning the FRBs exercised their own power, not power delegated by the Board. *Fox News Network*, 601 F.3d at 161. The Board argues that the same analysis applies here—because the FRBNY was acting pursuant to its independent authority under section 13(3) to make the AIG Loan and not under any power delegated by the Board, the FRBNY was not acting "on behalf of" the Board.

Ball argues that *Fox News Network* is inapposite for two reasons. First, the court in *Fox News Network* rested its analysis on the FRBs' powers under § 347b, which gives the FRBs independent authority to issue loans. Ball argues that here, the AIG Loan is fundamentally different because it was issued pursuant to section 13(3), which does not give the FRBs authority to independently issue loans, but instead "is clear that Board action is required before a Federal Reserve Bank may lend under this provision." (Pl. Reply 20). Second, Ball argues that the court in *Fox News Network* did not actually decide whether "on behalf of" means "under delegated

authority," and that this court (like the court in *Fox News Network*) should not defer to the Board's interpretation.  Ball further asserts that even if the court does find that "on behalf of" means "under delegated authority," "a Federal Reserve Bank's extension of credit under Section 13(3) is made pursuant to 'delegated authority from the Board.'"  (Pl. Reply 20) (citation omitted).

If the court were to adopt the reasoning in *Fox News Network*, then the FRBNY records in this case may well be Board records.  The *Fox News Network* court found that "[s]ince the Board neither issues nor authorizes the specific loans that Fox News seeks documentation of, we agree that the Federal Reserve Banks did not issue each loan on 'behalf of the Board,' or under the 'delegated authority' of the Board."  *Fox News Network,* 601 F.3d at 161.  It follows that if the Board did "authorize[] the specific loans"—as the Board unquestionably did here—then the FRBNY did issue the loans "on behalf of" the Board.[2]

However, this court finds that based on the plain language of the regulation (and in accordance with the Board's interpretation), mere authorization by the Board does not mean the FRBNY was acting on the Board's behalf.  The version of section 13(3) in force at the time of the AIG Loan allowed the Board to "authorize any Federal reserve bank" to make emergency loans.  "Authorize" means "[t]o give legal authority; to empower" or "[t]o formally approve; to sanction."  Black's Law Dictionary 159 (10th ed. 2014).  Under Ball's interpretation, because the Board authorized FRBNY to make the AIG Loan, this means the FRBNY was acting "on behalf of" the Board, and FRBNY's records qualify as Board records.

Conversely, the Board argues that "on behalf of" equals "under delegated authority" and that authorization alone is not enough to find the FRBNY acted on behalf of the Board; for a

---

[2] It is unclear whether all the loans at issue in *Fox News Network* were issued pursuant to § 347b or if some may have been issued pursuant to section 13(3).  That court only references § 347b in its discussion.

FRB to act on behalf of the Board, the Board has to have delegated its own power to the FRB. Therefore, for the Board to prevail, "on behalf of" must be more akin to delegation than authorization. To delegate is "[t]o send as a representative with authority to act; to depute;" "[t]o give part of one's power or work to someone in a lower position within one's organization;" or "[t]o choose someone to do a particular job, or to be a representative of a group or organization." Black's Law Dictionary 519 (10th ed. 2014).

An analysis of the phrase "on behalf of" reveals that it contemplates something more like delegation than authorization. Black's Law Dictionary defines "on behalf of" to mean "in the name of, on the part of, as the agent or representative of." Black's Law Dictionary 184 (10th ed. 2014); *see also* 2 Oxford English Dictionary 73 (2d ed. 1989) ("On the part of (another), in the name of, as the agent or representative of, on account of, for, instead of (With the notion of official agency."). An agent is "[s]omeone who is authorized to act for or in place of another; a representative." Black's Law Dictionary 75 (10th ed. 2014). A representative is "[s]omeone who stands for or acts on behalf of another." Black's Law Dictionary 1494 (10th ed. 2014). Intrinsic to all these definitions is the concept that one stands in another's shoes, representing a principal and exercising the principal's power. Acting "on behalf of" requires more than authorization; it requires a principal to delegate power to the representative to act on their behalf. Authorization is merely the act of giving permission or formally approving. Even if one is authorized to act, this does not mean they are acting on behalf of another. The court therefore agrees with the Board that for a FRB record to become a Board record, the FRB must have been performing a function that was more than just authorized by the Board—the FRB must be doing something more like acting under the Board's delegated authority.

This discussion is not merely academic, as the difference between "authorize" and "delegate" is evident in the language of section 13(3).  Contrary to Ball's assertion, section 13(3) does not require FRBs to act under the delegated authority of the Board—it only requires the Board to authorize (that is "to empower; to formally approve; to sanction") the FRBs' actions.  As it stood in 2008, section 13(3) stated that "[i]n unusual and exigent circumstances, the Board . . . may authorize any Federal reserve bank . . . to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange . . . ."  Section 13(3) gave the Board the power to authorize the FRBs to extend loans.  It did not give the Board the power to extend a loan, therefore the Board could not delegate that authority to the FRBNY.  FRBs could choose not to extend a loan, even after the Board had authorized it.  This suggests that even where Board authorization is necessary, "[t]he power to make loans is explicitly granted by statute only to the Federal Reserve Banks themselves." *Fox News Network*, 601 F.3d at 161.  The fact that the Board authorized the AIG Loan does not mean the FRBNY was acting on behalf of the Board when it made the loan, because the Board had not delegated authority to FRBNY and FRBNY was not acting as the Board's representative.  Therefore, FRBNY records with respect to the AIG Loan are not Board records under the Board's regulations.  The Board therefore was not required to search FRBNY's records.

Even if the court were to find that some of the FRBNY's records could be considered Board records, the Board has shown that collateral spreadsheets like the ones sought by Ball are not the type of Board records that would be housed at FRBNY for "administrative reasons" under 12 C.F.R. § 261.2(i)(1)(ii).  As the Board explains:

> [I]n conducting the search for records responsive to plaintiff's FOIA Request, [the Board] concluded that none of [the] Board records maintained for administrative reasons at the FRBNY, which include . . . examination and inspection workpapers and correspondence of state member banks and bank holding companies, informal enforcement action case

> files, supervisory activity correspondence, examiner training files, [and] legal activity
> files . . . were reasonably likely to contain records responsive to [Item 4.]  This is because
> . . . these records primarily relate to examination and supervisory activities, certain data
> collection and reporting activities, and the selection and appointment of FRB directors,
> and not to section 13(3) lending activities.

(Caperton Suppl. Decl. ¶ 7).  The Board also submitted the declaration of Robert deV. Frierson,

Secretary of the Board, who incorporated by reference the declaration of Jennifer Johnson,

former Secretary of the Board.  Johnson's declaration explains the various functions delegated by

the Board to the FRBs and the categories of "administrative reasons" documents that are stored

at FRBs.  (Frierson Decl. Ex. A).[3]  These declarations adequately describe what types of

"administrative reasons" records are housed at the FRBs, and why the collateral spreadsheets at

issue (if they exist) would not be among them.  Therefore, even if the FRBNY may have some

documents which could qualify as Board records, the Board has reasonably described the process

by which it decided to not search FRBNY records, and the court finds the Board's rationale

reasonable in light of the request.  Ball's "purely speculative claims about the existence and

discoverability of other documents" do not overcome the "presumption of good faith" afforded

to the Board's declarations.  *SafeCard Servs.*, 926 F.2d at 1200.

  b. <u>Documents 1 and 2—the Board Memorandums</u>

   The Board relies on Exemption 5 to withhold the legal memorandums analyzing the

Board's section 13(3) power to authorize the Maiden Lane Loan and the AIG Loan, invoking the

deliberative process privilege for both documents, and the attorney-client privilege for Document

1.  The Board also relies on Exemption 4 to withhold approximately two pages of Document 2

(which Ball contests), and Exemption 8 for a small portion of Document 2 (which Ball does not

contest).

---

[3] The Johnson declaration was apparently prepared for the *Fox News Network* case after it was remanded to the
district court, but was never filed with the court as the case settled.

i.   Exemption 5

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To satisfy its burden under the FOIA, the agency must show (1) that the records are inter-agency or intra-agency records, and (2) that they "would not be available by law to a party other than an agency in litigation with the agency."  Courts have construed the latter requirement as akin to the protections available to parties in civil litigation, including the attorney-client privilege, attorney work product privilege, and the executive deliberative process privilege.  *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 4 (D.C. Cir. 2014).

The parties here do not dispute that Documents 1 and 2 are inter-agency or intra-agency records, and the Board asserts that they would not be available by law under the deliberative process privilege, which is applicable to agency materials that are "both 'predecisional' and a part of the 'deliberative process.'"  *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 339 (D.C. Cir. 2011).  Ball does not challenge the Board's invocation of the deliberative process privilege *per se* —he does not argue that the documents are not predecisional[4] or that they were not part of the agency's deliberative process.[5]  Rather, he alleges that the Board adopted the memorandums as its "working law," meaning the documents can no longer be withheld based on the deliberative process privilege.

The court is satisfied, based on the *Vaughn* index and the Board's declarations, that Documents 1 and 2 "'reflect[ ] advisory opinions, recommendations, and deliberations

---

[4] A document is predecisional if it "was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made."  *Petroleum Info. Corp.,* 976 F.2d at 1434 (internal quotation marks omitted).

[5] A document is part of the deliberative process when it "makes recommendations or expresses opinions on legal or policy matters."  *Vaughn v. Rosen,* 523 F.2d 1136, 1144 (D.C. Cir. 1975).

comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'" *Elec. Frontier Found.*, 739 F.3d at 7 (citation omitted). On their face, the documents were properly withheld pursuant to Exemption 5.

### 1.   "Working Law"

Under the "working law" FOIA doctrine, "the reasons which did supply the basis for an agency policy actually adopted . . . if expressed within the agency, constitute the 'working law' of the agency" and are not protected from disclosure. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152-53 (1975). "Exemption 5 does not apply to final agency actions that constitute statements of policy or final opinions that have the force of law, or which explain actions that an agency has already taken." *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 677 (D.C. Cir. 1981). The purpose of the doctrine is to prevent agencies from "develop[ing] a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). Documents that "are not the ideas and theories which go into the making of the law, [but] are the law itself . . . should be made available to the public." *Elec. Frontier Found.*, 739 F.3d at 8.

In response to Ball's assertion that the documents constitute the Board's working law, the Board explains that Document 1 "recounts legal advice and recommendations provided orally by Board attorneys to Board members prior to March 16, 2008 in support of staff's recommendation that the Board authorize the Maiden Lane Loan, as well as staff's analysis of the Board's legal authority to extend the Loan, and staff's recommendations with regard to conditions that must be

satisfied to meet the statutory prerequisites of section 13(3)." (Caperton Decl. ¶ 11).[6]  The Board

describes Document 2 as "a draft memorandum from [Board General Counsel] Alvarez and other

Board staff members . . . to the Board dated September 15, 2008 entitled Issues Related to

Possible IPC Lending to American International Group and labeled ***DRAFT***.  Document

2 contained Board staff's analysis of AIG's operations, current difficulties, liquidity, solvency,

and related issues, and discussed possible risks and benefits of a loan to AIG to assist the Board

in deciding whether to authorize the AIG Loan." (*Id.*).  The Board argues that these are not the

types of documents that are traditionally considered the working law of the agency, but instead

are "advisory opinions [and] recommendations" made by subordinates to their superiors

"comprising part of a process by which governmental decisions and policies are formulated, [or]

the personal opinions of the writer prior to the agency's adoption of a policy." *Elec. Frontier

Found.*, 739 F.3d at 7.

    The D.C. Circuit recently synthesized prior decisions regarding similar documents in

*Electronic Frontier Foundation*:

> The authorities that control the disposition of this case are the decisions holding that the
> deliberative process privilege *does* cover legal memoranda that concern the *advisability*
> of a particular policy, but do not authoritatively state or determine the agency's policy.
> For example, we have held exempt from disclosure memoranda containing legal advice
> from the Legal Adviser to the Secretary of State "concerning United States policy on
> issues involving" affairs in the Middle East. *Brinton v. Dep't of State,* 636 F.2d 600, 602
> (D.C. Cir. 1980).  The court explained that "[t]here can be no doubt that such legal
> advice, given in the form of intra-agency memoranda prior to any agency decision on the
> issues involved, fits exactly within the deliberative process rationale for Exemption 5."
> *Id.* at 604.  The Legal Adviser's "role is to give advice to those in the State Department
> who do make the policy decisions," and, thus, the "flow of advisory material is exactly
> opposite of the paradigm of 'final opinions,' which typically flow from a superior with
> policy-making authority to a subordinate who carries out the policy." *Id.* at 605 (citation
> omitted).  In *Murphy v. Dep't of Army,* 613 F.2d 1151, 1154 (D.C. Cir. 1979), this court
> held that the privilege covers a memorandum from the Army General Counsel to

---

[6] Caperton explains that while Document 1 was created on April 2, 2008—after the Board's March 16 decision—it
memorializes advice and recommendations made before the decision.  (Caperton Decl. ¶ 11).  Ball does not
challenge this assertion or argue that the timing of the memorandum impacts the application of Exemption 5.

Assistant Secretary providing advice on whether to enter a contract, because "[t]he Assistant Secretary *who had decision-making power* . . . sought *advice* from the general counsel . . . on the legal questions raised." (citations omitted) (emphasis added) . . . [In this case, e]ven if the OLC Opinion describes the legal parameters of what the FBI is *permitted* to do, it does not state or determine the FBI's policy. The FBI was free to decline to adopt the investigative tactics deemed legally permissible in the OLC Opinion.

*Id.* at 8-10 (emphasis in original). Similarly, Documents 1 and 2 do not dictate or describe Board law or policy—they contain recommendations and opinions of Board staff given to the Board to assist in their decision-making.

### a. Public Adoption

Ball argues that Board personnel made numerous public statements that indicate that the Board has adopted Documents 1 and 2 as the working law of the agency. In support of this assertion, Ball cites the following:

- A press release issued the same day the Board authorized the AIG Loan, stating that the Board had "determined, in current circumstances, [that] a disorderly failure of AIG could add to already significant levels of financial market fragility and lead to substantially higher borrowing costs, reduced household wealth, and materially weaker economic performance." (Pl. Mot. 5).

- A statement by Board Vice Chairman Donald L. Kuhn in testimony before the Senate Committee on Banking, Housing, and Urban Affairs, in which Mr. Kuhn said that "the prospect of AIG's disorderly failure posed considerable systemic risks . . . as a consequence of its significant and wide-ranging operations. Such a failure would also have further undermined business and household confidence . . . ." (*Id.* at 5-6).

- Testimony of Board Chairman Ben Bernanke before the House Committee on Financial Services in February 2009, where he described the Board's authorization of the loans to "stabilize systemically critical financial institutions" as "essential to protect the financial system as a whole." (*Id.* at 6).

- A report to Congress by the Board stating that "[t]he sudden imminence of insolvency for Bear Stearns, the large presence of Bear Stearns in several important financial markets . . . and the potential for contagion to similarly situation firms . . . if Bear Stearns were suddenly unable to meet its obligations to counterparties" supported the Board's determination "that unusual and exigent circumstances existed" to justify the invocation of Section 13(3). (*Id.*).

- Testimony given in July 2010 by Board General Counsel Scott Alvarez, one of the authors of Document 1, to the Financial Crisis Inquiry Commission ("FCIC").

During that testimony, Alvarez was asked "Would it be the case that insofar as these kinds of memoranda and decisions interpret what are admittedly relatively vague terms of [section] 13(3), do you guys regard that as worthy of *Chevron* deference?" Alvarez responded "Absolutely. Now, even I will admit that *Chevron* deference is strongest when there's a rulemaking involved, and this wasn't a rulemaking, but we are an expert agency interpreting our own statute and we have a long history in these interpretations, so I think we would get some deference." (*Id.* at 6-7).

A document that was not originally the working law of the agency can become so "'if an agency chooses *expressly* to adopt or incorporate by reference' a memorandum that would have otherwise been protected by the privilege." *Elec. Frontier Found.*, 739 F.3d at 10 (emphasis in original) (citing *Sears, Roebuck & Co.*, 421 U.S. at 161 ("[W]hen adopted, the reasoning becomes that of the agency and becomes its responsibility to defend.")). However, "'the [D.C. Circuit] has refused to equate reference to a report's conclusions with adoption of its reasoning, and it is the latter that destroys the privilege.' *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1197 (D.C. Cir. 1991) (a department head's 'confused statement' in testimony before a Senate committee that might be read as a reference to the privileged document 'fell far short of the *express* adoption required by *Sears*.'); *Common Cause v. IRS,* 646 F.2d 656, 660 (D.C. Cir. 1981) ('casual allusion in a post-decisional document to subject matter discussed in some pre-decisional, intra-agency memoranda is not the express adoption or incorporation by reference which . . . would remove the protection of Exemption 5.')." *Id.*

The first four Board statements cited by Ball shed no light on whether the Board adopted Documents 1 and 2 as its working law. At most, the press release, testimony, and Congressional report merely recount the general factual background and reasons for the Board's decisions with respect to the Maiden Lane Loan and the AIG Loan. Nowhere are Documents 1 and 2 mentioned or relied on as the basis for those decisions. The Board's generic explanation of its prior decision-making process says nothing about whether Documents 1 and 2 have been adopted as the Board's working law.

The last example—Alvarez's testimony to the FCIC—is a closer call.  Alvarez seemed to suggest that the memorandums should be entitled to deference, which may suggest that they represent the Board's official interpretation of section 13(3) and have been adopted as the agency's official policy.  But this argument is problematic for several reasons.  First, the context of Alvarez's statement casts significant doubt as to whether it is worthy of the significance Ball ascribes to it.[7]  In the course of Alvarez's testimony, FCIC identified a memo regarding a specific lending facility and asked if it was "a fair representation of the Board's views of the meaning and substance of the various key provisions of 13(3)?"  Alvarez responded that the memo "doesn't try to capture all of our thoughts on 13(3), it just captures what we thought about 13(3) as it applied to the CPFF.  So there's memos that we wrote on a variety of different 13(3) transactions and they're slightly different or focused on different things depending on what the author [] – what the kind of loan was that we were dealing with."  When pushed on whether the Board had memorialized its interpretation of section 13(3), Alvarez explained that "we didn't do a single memo that tried to encapsulate, we didn't do a law review article . . . we were more *ad hoc* . . . when Bear Stearns, we did a Bear Stearns memo, when CPFF, we did that. TALF, we did a TALF memo, we did an AIG memo, we did one for each extension."  (Caperton Suppl. Decl. ¶ 3).

Alvarez disclaimed the proposition that the memos are the working law of the agency regarding its interpretation of section 13(3), and explained that a memo was drafted for each transaction, and that the contents of each memo differed depending on the facts and circumstances.  He noted that the Board did not try to encapsulate its thinking regarding the legal

---

[7] Apparently there is no transcript of the testimony, so the Board attempted to recreate Alvarez's testimony from an audiofile of the interview.  Since Ball does not contest the authenticity of the transcription, the court will assume it is accurate.

interpretation of section 13(3) into one document, but created multiple documents, each of which "just capture[d] what we thought about 13(3) as it applied" to the different transactions.  (*Id.*). This suggests that Documents 1 and 2 were not the agency exposition of its working law, but were instead deliberative documents regarding the pros and cons of making particular decisions.

And although Alvarez claimed the Board should be afforded *Chevron* deference, it is not clear exactly what Alvarez believed should be afforded that deference.  When asked if "these kinds of memoranda and decisions" were worthy of *Chevron* deference, Alvarez responded that "we are an expert agency interpreting our own statute and we have a long history in these interpretations so I think we would get some deference."  (*Id.*).  While it is possible Alvarez meant that the memos should be given deference as the written record, it is also possible that he meant that the Board's actual decision to authorize the loans, based on its interpretation of section 13(3), should receive deference.

In addition, it is not clear whether Alvarez had the authority to adopt Board policy in the first place.  Ball acknowledges this possibility, Pl. Reply 5-6, but nonetheless argues that Alvarez's statement is at least some evidence of the Board's adoption of Documents 1 and 2 as its working law, especially considering that the Board apparently relied on the advice in Documents 1 and 2 by authorizing the loans.  Ball cites *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 357 n.6 (2d Cir. 2005), in which the court held that "even assuming *arguendo* that these employees do not themselves have the power to adopt or incorporate the OLC Memorandum, their statements serve as evidence of the Department's position on the matter." However, in *La Raza*, the "repeated references to the OLC Memorandum" at issue had been made not only by subordinate employees, but also the Attorney General, who did have the authority to adopt agency policy.  *Id.* at 357.  The court in *La Raza* did not suggest that it would

have given any weight to the employee statements if they had not also been made by the

Attorney General.  *Id.*  Here, while Alvarez is a senior agency official, the final decision whether

to authorize the loans was made by the Board, not Alvarez.  The Board could choose to use or

ignore the advice in Documents 1 and 2, and there is no indication as to how Documents 1 and 2

influenced the Board's decision, if at all.  Ball has not provided sufficient evidence that

Documents 1 and 2 were adopted as the Board's working law, and "it is [the plaintiff's] and not

the Board's burden to establish that predecisional records have been adopted as policy."

*McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 849 F. Supp. 2d 47, 63 (D.D.C. 2012).

The Board has therefore met its burden with respect to the application of Exemption 5.

The court's decision is in accord with the courts in *McKinley v. FDIC*, 744 F. Supp. 2d

128 (D.D.C. 2010) ("*McKinley I*"); *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d

331 (D.C. Cir. 2011) ("*McKinley D.C. Cir.*"), and *McKinley v. Bd. of Governors of the Fed.*

*Reserve Sys.*, 849 F. Supp. 2d 47 (D.D.C. 2012) ("*McKinley II*").  In *McKinley I*, the Board

withheld, *inter alia*, a memorandum from the Board's General Counsel and legal staff to the

Board regarding the authority of the Federal Reserve to provide an extension of credit to Bear

Stearns through JPMorgan Chase.  (Caperton Decl. Ex. F).  The memorandum in *McKinley I* is

substantially similar to Document 1 and concerns a separate but related transaction to the Maiden

Lane Loan.  (Caperton Decl. ¶ 19).  The documents have the same date, were prepared by the

same authors, and concern loans made pursuant to section 13(3) two days apart, both regarding

Bear Stearns.  The court in *McKinley I* held that the memorandum in that case could be withheld

pursuant to Exemption 5; the D.C. Circuit affirmed that decision in *McKinley D.C. Cir.*

In *McKinley II*, the court considered a document almost identical to Document 2.  The

plaintiff in that case dropped its objection to the withholding of Document 2 specifically, but

challenged the withholding of an earlier draft.  "Document 2 is substantially the same document

as document 753-764 in *McKinley II*.  Document 2 and document 753-764 have the same date,

authors, recipients, and subject, but contain some differences in text, reflecting that Document 2

is an updated draft of document 753-764."  (Caperton Decl. ¶ 25).  The court in *McKinley II*

upheld the agency's assertion of Exemption 5.  While Ball contends that *McKinley II* is

inapposite because that court did not consider the exact same memorandum as Document 2, he

has not identified any salient difference which should lead this court to disagree with the holding

in that case.  As in the *McKinley* cases, the court here finds that Documents 1 and 2 were

properly withheld pursuant to the deliberative process privilege under Exemption 5.

      c.   <u>Documents 3 and 4—Collateral Spreadsheets – Exemption 8</u>

      The Board withheld Documents 3 and 4 in their entirety pursuant to Exemption 8, which

allows agencies to withhold records "contained in or related to examination, operating, or

condition reports prepared by, on behalf of, or for the use of an agency responsible for the

regulation or supervision of financial institutions."  5 U.S.C. § 552(b)(8).  Ball does not dispute

that Documents 3 and 4 are "contained in or related to examination, operating, or condition

reports."  Given that the "'related to' language [in Exemption 8] casts a wide net of non-

disclosure over any documents that are logically connected to an 'examination, operating, or

condition report[ ],'" *Pub. Investors Arbitration Bar Ass'n v. SEC*, 930 F. Supp. 2d 55, 62

(D.D.C. 2013), and Ball does not contest that the spreadsheets are related to bank examination

reports, the court finds that the Board has sufficiently established this element.

      Ball's sole argument in opposition to withholding of the documents under Exemption 8 is

that the collateral spreadsheets contain information provided to the Board from the FRBNY, and

because the FRBs are not "financial institutions," the spreadsheets were not "prepared . . . for the

use of an agency responsible for the regulation or supervision of financial institutions." Ball

asserts that: (1) it is illogical and erroneous for the Board to argue that the FRBs are both

regulators and regulated entities; (2) the cases interpreting Exemption 8 have relied on two

definitions of "financial institution," neither of which contemplates the FRBs as financial

institutions; and (3) finding that the FRBs are financial institutions would not further the

purposes of Exemption 8, which is further evidence that the exemption does not apply.

As with any question of statutory interpretation, the court starts with the plain meaning of

the text. That interpretation is informed by the D.C. Circuit's teaching that "the meaning of

exemption 8 [is] clear," and "its broad, all-inclusive scope should be applied as written since

Congress ha[s] 'intentionally and unambiguously' so contemplated." *Gregory v. FDIC,* 631 F.2d

896, 898 (D.C. Cir. 1980) (per curiam) (quoting *Consumers Union of United States, Inc. v.

Heimann,* 589 F.2d 531, 533 (D.C. Cir. 1978)). Because "Congress has intentionally and

unambiguously crafted a particularly broad, all-inclusive definition . . . it is not [the court's]

function, even in the FOIA context, to subvert that effort." *Heimann,* 589 F.2d at 533; *see also

McKinley I*, 744 F. Supp. 2d at 143.

Bearing in mind the broad scope of Exemption 8, the court must determine the meaning

of "financial institution" as used in the exemption. Few courts have had occasion to analyze

whether the FRBs qualify as financial institutions; the Board identified only a single case where

a court held that FRBs are financial institutions, and Ball did not cite any cases that held they

were not. In *Clarkson v. Greenspan*, No. 97-2035, 1998 U.S. Dist. LEXIS 23566 (D.D.C. June

30, 1998), the FRBs sought to withhold examination reports conducted by the Board, arguing

that the Board was an agency responsible for the supervision of the FRBs, which in turn were

financial institutions. The court held that:

A financial institution is any "organization authorized to do business under state or federal laws relating to financial institutions, including, without limitation, banks and trust companies, . . . ." *Pub. Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C. Cir. 1991) (quoting Black's Law Dictionary 568 (5th ed. 1979)) . . . Federal Reserve Banks serve as the "bankers' banks," doing "for existing banks what an ordinary bank does for its customers." H. Rep. No. 69, 63rd Cong., 1st Sess. 32, 36 (1913). The Federal Reserve Banks are regulated by the Board of Governors of the Federal Reserve System. The Banks withheld any examinations of the Reserve Banks conducted by or for the Board of Governors. Since the examinations were done by or for the agency responsible for regulating the Federal Reserve Banks, the defendant Banks properly invoked Exemption 8.

*Id.* at *23-24. Other courts have interpreted "financial institution" broadly to include other non-traditional financial entities. *Pub. Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C. Cir. 1991) (the National Consumer Cooperative Bank was a financial institution because "[t]he NCCB is authorized to do business under Title 12, the portion of the United States Code relating to 'Banks and Banking' and other matters concerning financial institutions. Moreover, institutions providing credit services, as does the NCCB, are included within the term 'financial institutions.'"); *Nat'l Cmty. Reinvestment Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 135 (D.D.C. 2003) (dismissing case for lack of standing but finding that credit unions are financial institutions under Exemption 8); *Mermelstein v. SEC*, 629 F. Supp. 672, 675 (D.D.C. 1986) (Boston Stock Exchange was a financial institution based on a definition of financial institution found in the legislative history of the Sunshine Act, a statute similar to FOIA).

Courts have generally used two definitions of "financial institution" to guide their analysis. First, Black's Law Dictionary defines financial institution as "[a] business, organization, or other entity that manages money, credit, or capital, such as a bank, credit union, savings-and-loan association, securities broker or dealer, pawnbroker, or investment company." Black's Law Dictionary 748 (10th ed. 2014).[8] Second, courts cite the definition in the legislative

---

[8] Black's did not define the term "financial institution" at the time FOIA was enacted. The D.C. Circuit used a prior edition of Black's in its decision in *Public Citizen*, as did the court in *Clarkson* (which held that Federal Reserve

history of the Sunshine Act, which uses the term twice (and in one instance adopts FOIA

Exemption 8 in its entirety). A Senate report for the Sunshine Act defined financial institutions

as including "banks, savings and loan associations, credit unions, brokers and dealers in

securities or commodities, such as the New York Stock Exchange, investment companies,

investment advisors, self-regulatory organizations subject to 15 U.S.C. § 78(s) and institutional

managers as defined in 15 U.S.C. § 78m(f)." S. Rep. No. 94–354, at 24 (1975).[9]

Ball argues that because the FRBs are not banks in the traditional sense, they are not the

type of institution intended to be covered by Exemption 8. The exemption covers "financial

institutions," not just banks. Even if Exemption 8 was so limited, FRBs could still be considered

banks. Ball notes the distinction in the Federal Reserve Act between "reserve bank" and "bank,"

"national bank," or "member bank" to argue that FRBs are statutorily distinct from normal

banks. (Pl. Opp'n 18). While Ball is correct that a reserve bank is distinguished from a national

bank or member bank, it is not true that the Federal Reserve Act specifically excludes FRBs

from the definition of "bank." In fact, the Act states that "[w]herever the word 'bank' is used in

this chapter, the word shall be held to include State bank, banking association, and trust

company, except where national banks or Federal reserve banks are specifically referred to." 12

U.S.C. § 221. "Bank" therefore includes FRBs in at least some sections of the Federal Reserve

Act, and in fact there are multiple sections in the Act where FRBs and member banks are

Banks are financial institutions). *See Pub. Citizen*, 938 F.2d at 292; *Clarkson*, 1998 U.S. Dist. LEXIS 23566, at *23.

[9] "Financial institution" is defined elsewhere in the U.S. Code, but these definitions are ultimately inconclusive. For example, Title 18 defines financial institution to include Federal Reserve Banks for the purposes of a computer fraud statute, but excludes Federal Reserve Banks in a bribery statute. *See* 18 U.S.C. §§ 1030, 212. The Bankruptcy Code definition includes Federal Reserve Banks. 11 U.S.C. § 101(22)(A). A provision in the Graham-Leach-Billey Act regarding fraudulent access to financial information resembles the Black's definition: "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution." 15 U.S.C. § 6827(4)(A). While these definitions are not dispositive, they are some evidence that the term does not categorically exclude FRBs.

referred to interchangeably.  *See* 12 U.S.C. § 248 (granting the Board the authority "[t]o examine

at its discretion the accounts, books, and affairs of each Federal reserve bank and of each

member bank"); § 501 (making it unlawful for any employee of "any Federal reserve bank, or

any member bank" to certify a check without an underlying deposit).  Further, as the court in

*Clarkson* noted, the FRBs are traditionally considered the "'bankers' banks.'"  *Clarkson*, 1998

U.S. Dist. LEXIS 23566, at *23.

 Bank or not, FRBs are included in the broader definition of financial institution, which is

any "entity that manages money, credit, or capital."[10]  Pursuant to the Federal Reserve Act, each

FRB commences with a subscribed capital of at least $4,000,000.  12 U.S.C. § 281.  FRBs may

receive deposits, make advances on promissory notes, buy and sell debentures, and buy and sell

bonds and notes.  *See* 12 U.S.C. §§ 342, 347d, 347, 347c, 350, 355(1).  FRBs may act as

depositories for various institutions, §§ 393-95, and "[t]he moneys held in the general fund of the

Treasury . . . [may] be deposited in Federal reserve banks . . . and disbursement may be made by

checks drawn against such deposits."  *Id.* at § 391.  Ball is correct that FRBs engage in other

activities which are not the domain of traditional financial institutions, including managing the

nation's monetary policy and examining member banks.  It may also be true that the FRBs have

a public purpose, at least in part.  This does not mean, however, that the FRBs do not also

function as financial institutions.  Like many other banks or financial institutions, the FRBs may

"adopt and use a corporate seal . . . make contracts . . . sue and be sued . . . [and] prescribe . . .

bylaws . . . regulating the manner in which its general business may be conducted."  12 U.S.C. §

---

[10] The examples of financial institutions provided in Black's—"such as a bank, credit union, [etc.]"—are representative and do not provide an exhaustive list of entities which are financial institutions.  *See Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.*, No. 14-CV-1138, 2014 WL 5893464, at *12 (D.D.C. Nov. 13, 2014) ("The words 'such as' preceding the example have meaning, and indicate that the example that follows is not exclusive but only an available option.").

341.  As a publication by the Federal Reserve titled "The Federal Reserve System: Purposes & Functions" explains, the FRBs "carr[y] out a variety of System functions, including operating a nationwide payments system, distributing the nation's currency and coin, supervising and regulating member banks and bank holding companies, and serving as banker for the U.S. Treasury . . . each Reserve Bank acts as a depository for the banks in its own District."[11]  The FRBs are hybrid entities, with some public and some private functions,[12] but at least some of their functions are those of a financial institution.  They manage "money, credit, or capital," and therefore under a plain meaning interpretation they qualify as financial institutions.

Contrary to Ball's assertion, finding the FRBs to be financial institutions would further Exemption 8's purposes: "(1) to ensure the security of financial institutions by eliminating the risk that disclosure of examination, operation, and condition reports containing frank evaluations of the investigated banks [] might undermine public confidence and cause unwarranted runs on banks; and (2) to safeguard the relationship between the banks and their supervising agencies because if details of the bank examinations were made freely available to the public and to banking competitors, banks would cooperate less than fully with federal authorities."  *McKinley I*, 744 F. Supp. 2d at 142-43, *aff'd on other grnds, McKinley D.C. Cir.*, 647 F.3d 331.  As the D.C. Circuit has explained, "the exemption was drawn to protect not simply each individual bank but the integrity of financial institutions as an industry."  *Gregory*, 631 F.2d at 898.  Ball argues

---

[11] "The Federal Reserve System: Purposes and Functions" is a Board publication upon which courts have relied to explain the workings of the Federal Reserve.  *See Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 343 n.2 (1979); *Fox News Network, LLC v. Bd. of Governors of The Fed. Reserve Sys.*, 639 F. Supp. 2d 384, 401 (S.D.N.Y. 2009), *vacated and remanded on other grounds*, 601 F.3d 158 (2d Cir. 2010).  In the Purposes and Functions' "Glossary of Terms," financial institution is defined broadly: "Institution that uses its funds chiefly to purchase financial assets, such as loans or securities (as opposed to tangible assets, such as real estate)."  BD. OF GOVERNORS, FED. RESERVE SYSTEM, THE FED. RESERVE SYSTEM:  PURPOSES AND FUNCTIONS (2005).

[12] *See U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26 (1928) ("Instrumentalities like the national banks or the federal reserve banks, in which there are private interests, are not departments of the government.  They are private corporations in which the government has an interest.").

that because "a Federal Reserve Bank [does not have] the option of declining to provide information that the Board determines 'in its discretion' to examine," release of the records here could not possibly chill the frank exchange of information between the Board and FRBNY.  (Pl. Mot. 20).  However, as the Board points out, the fact that it can require examination of the FRBs is no different than any other financial institution subject to mandatory supervision by a federal regulator.  If a financial institution cannot expect confidentiality, it may be less cooperative and forthright in its disclosures, even if an examination is mandatory.  There is no reason to believe the FRBs would not react the same way.  *See* Roseman Decl. ¶ 12.  Similarly, it seems likely that financial institutions which provide the FRBs with information would be significantly more cautious if they knew that, once transmitted to the Board, their information lost the protection to which it would normally be entitled.  Creating an environment conducive to frank exchange is particularly important in circumstances like the 2008 financial crisis, where real-time data was circulating between financial institutions and regulators at lightning speed, and this frank exchange is what Congress sought to protect with Exemption 8.

Even if the Banks are not "financial institutions" under Exemption 8, the Board could likely still withhold Documents 3 and 4.  "[T]he D.C. Circuit has held that, for purposes of Exemption 8, 'examination reports need not pertain to an institution that is regulated or supervised by the withholding agency.'  This means that agencies that do not directly regulate or supervise a particular financial institution may still withhold information about that institution under Exemption 8, so long as the withholding agency is one that is 'responsible for the regulation or supervision of financial institutions' more generally."  *Pub. Investors Arbitration Bar Ass'n*, 930 F. Supp. 2d at 62-63, *aff'd*, 771 F.3d 1 (D.C. Cir. 2014) (citing *Pub. Citizen,* 938 F.2d at 294).  The Board is clearly an agency that is "responsible for the regulation and

supervision of financial institutions more generally."  The parties did not address whether Bear

Stearns and AIG themselves are financial institutions, but it is reasonably likely that they are,

meaning the Board could likely have withheld the documents under Exemption 8 even if the

FRBNY was not a financial institution.

        d.  <u>Segregability</u>

     As noted above, under FOIA an agency must produce "any reasonably segregable

portion" of a record that is not exempt from disclosure, 5 U.S.C. § 552(b), and the court must

affirmatively determine whether the agency has done so.  Caperton's declaration explains that he

"worked with other members of the Board's Legal Division to create the *Vaughn* Index" for

Documents 1 and 2 and "personally reviewed each page of information identified in the *Vaughn*

index." (Caperton Decl. ¶ 17).  In addition to this review, Caperton affirms that Documents 1

and 2 are substantially similar to documents withheld in their entirety in *McKinley I*, *McKinley*

*D.C. Cir.*, and *McKinley II*.  (Caperton Decl. ¶ 18).  With respect to Documents 3 and 4,

Caperton "determined that they contained no reasonably segregable, non-exempt information"

because he "determined that the entirety of those documents, which are bank examination

workpapers, are contained in or related to examination, operating or condition reports prepared

by, on behalf of, or for the use of the Board in its capacity as financial institution supervisor of

the FRBNY, and that no portion of those documents was unrelated to a bank examination."

(Caperton Decl. ¶ 33).  The *Vaughn* index reasonably describes the documents withheld and the

basis for withholding them in full.  The court is therefore satisfied that the Board has produced

all reasonably segregable nonexempt information.

**IV.     CONCLUSION**

For the foregoing reasons, the Board's motion for summary judgment is granted and Ball's motion for summary judgment is denied.  Because Exemptions 5 and 8 permit the Board to withhold Documents 1-4 in their entirety, the court need not discuss the Board's other bases for withholding.  An appropriate Order accompanies this Memorandum Opinion.


Date:  March 31, 2015


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge